May it please the Court. My name is Glenn Solomon. I represent the plaintiffs in this matter. At this time, I have nothing to add to my briefs, but I'm here to respond to questions from the Court if there are any at this time. Otherwise, I'll reserve my time for rebuttal. Well, that's really not fair in the sense that if you have something you want to say, you need to say it now so that they can respond, and then you'll have an opportunity to reply. But you can't kind of lie in the weeds and let them argue, and then they don't have a chance. They don't know what they're arguing about. So if you simply want to submit on the briefs, I could ask them if they would like to submit on the briefs, and we would adjourn. And I would ask you that if, whether or not Restaurants Unlimited, if Mr. Solomon makes no argument whether you'd like to submit on the briefs or not. It's your choice. All right. Okay. So do you have anything you want to make points? Otherwise, they'll make an argument and we'll be done. I have nothing at this time. Okay. Then there will be nothing further, if you understand my drift, because you can't Thank you. If you want to waive your argument, then I'll accept that. They'll have an opportunity to argue, and then the case will be submitted. I'll waive the argument. Thank you. Good morning, and may it please the Court. My name is Scott O'Byrne. I'm here representing Restaurants Unlimited, Inc., this morning. For purposes of argument, I'll refer to it as RUI, if that's all right. It's a little cumbersome in a case where there's essentially six wrongful termination cases brought as one action, limited time to argue. So what I'd like to do is highlight just what I believe are the clearest examples of dispositive issues for each of the claimants. It's probably the easiest way for us to get through in the time we have allotted. I did want to touch on the motion to strike that's before the Court. Everyone makes mistakes, and leniency is often shown. The Ninth Circuit has shown in the past that if you violate the very rules that have been violated here, not creating an appropriate excerpt of record, not citing to that excerpt of record, and your opponent points that out in opposition, and you do nothing in reply to fix the problem, and, indeed, there's no reply at all in this case, that that can justify dismissal of the appeal. That's the Hanver v. Stanford University case of 210F3rd, 1038. We would submit the entire appeal should be stricken on that basis. Short of that, we believe that any evidence relied upon by appellants that is not provided in the submitted excerpts of record should not be considered by the Court. I don't know if Your Honors or your clerks had the experience that I had of pouring back through the summary judgment record, trying to recreate and fact-check, but it is quite a frustrating experience. Moving to the merits or lack thereof, briefly. Ginsburg. Let me just say, for your benefit and for Mr. Solomon's benefit, I take your point, because we do have these rules for a reason, and that is there's that famous case that says we're not like pigs hunting truffles. It's not our job to track down the record sites. And if we don't have an excerpt of record that is cross-referenced with the brief, then we, in effect, have to recreate that. So I understand your point. Thank you, Your Honor. I would like to move to Mr. Shifflett briefly, if I could. The dispositive issue with him is a statute of limitations issue. There's no dispute that he filed his administrative charge 385 days after the termination. Mr. Solomon is arguing for essentially a discovery rule that the cause of action shouldn't accrue until the discharged employee has some reason to suspect that the termination was unlawful. Judgment now, you've rejected that very argument in the Lebowski case at 535 F. 3rd, 1044, in which the Ninth Circuit has clearly said the cause of action accrues at the time of the adverse employment action. There are two equitable principles by which it can be told, equitable tolling or equitable estoppel. Opposing counsel has not raised either of those, so they're waived, and there's no evidence in the record to support an equitable extension of the limitations, period. Moving to the fourth prima facie element, and, Your Honor, Judge Ripple, to your point, what is the standard? But clearly, the standard is at least substantially younger. In this case, we have three individuals who were not replaced by substantially younger individuals. We have Mr. Gates, who was replaced by someone two years older. We have Mr. Bleekus, who was replaced by someone nine years younger, also in the And we have Mr. Frye replaced by someone 53 years old and eight years younger than Mr. Frye. Looking at the Ninth Circuit's jurisprudence, and we have the Diaz v. Eagle Produce case, and the Ninth Circuit in that case adopted the Seventh Circuit standard, which has long held that 10 years is the standard for substantially younger. So in this case, we have three of our plaintiffs that don't meet that prima facie burden. Their case should be dismissed on that basis alone. Another prima facie element that several, at least two of the problems the plaintiffs have problems with is the third element. Is there an adverse employment action here? There's no question that Mr. Gates and Mr. Gonzalez quit. The question is whether the working conditions were so intolerable that it wasn't really a resignation. It was basically a termination, a constructive termination. So we look at what our standard is in the Ninth Circuit. We look at cases like Brooks v. City of San Mateo, and we have sufficiently extraordinary or egregious conduct to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job. Subsequent in the Poland case, we said, listen, to get a constructive discharge, you have to go beyond even proving your discrimination case. It's something above and beyond. So the short story with the case law is that it has to be a situation in which the employee really had no choice. No reasonable employee would have a choice. So the question is, did Mr. Gates and Mr. Gonzalez, did they make a choice, or was the sort of the decision forced upon them? You look at the record for both individuals, it was clearly a choice. With Mr. Gates, we have just a brief snapshot of the months leading up to his termination. Summer of 2008, he has some counseling on labor and food cost systems at RUI. End of this October 2008, gets some verbal counseling on food quality and food costs. October 31st, a few days later, he gets a written  It's a very systemic way to run a restaurant. Food costs, labor costs are the way that they earn any profit at all. And if those are cost measures or sacrifice, the company doesn't make money. So he gets a written warning. Hey, listen, there's these tools. Please use them. And he's met. And his supervisor meets with him about that warning. No indication that it's a final warning. No indication that his job is in jeopardy. It's just, hey, you're not getting this done. You need to get it done. It's happened to many employees all over the country. Mr. Gates' reaction? He used to quit. That's it. That's the record. It doesn't come close to a constructive termination. We look at Mr. Gonzalez very similar in the few months leading up to his termination. He gets verbal counseling in September 2008. Again, he works with his general manager to go through the RUI tools. He's counseled in early October after several food items ran short at a dinner service, which, if any of you worked in a restaurant, you run short on food items on a Friday, and that's a real problem. About a week later, in mid-October, he's got verbal counseling on a quality test that's done with the food, which, as outlined in our brief, they have very extensive testing to make sure that the food quality is consistent. And if I go into a Stanford's here or Stanford's in Seattle, I'm going to have the same food experience, and they take that very seriously. So he's counseled about that. Mr. Gonzalez gets a formal warning in the middle of October, and they say further problems could lead to further discipline. It's not styled as a final written warning. He's not told you have two weeks or 30 days to improve. And, in fact, the general manager says in the warning, I'm here for you. If you need help, let me know, and I'll work with you on these issues. Then we have Mr. Gonzalez in reaction. He quits. Again, it doesn't come close to a constructive termination. Now, he had a choice to make. I either, the water's getting pretty hot here for me. I can either stick it out. I can fight for my job. There's some testimony in the record about labor costs that he didn't think were fair. He could go to that general manager, pitch his case. He could go to the regional director. He could go to the food and beverage director. He could say, I don't think this is fair. Does he do that? No. He says, I'm going to make the choice to resign so I don't have a termination in my employment record. That was his choice to make. It's not a constructive termination. So that leaves us with one plaintiff, Mr. Borges. And then we get into Judge Acosta at the district court. In fact, on all of the plaintiffs, he decided that they didn't meet the prima facie level of meeting the employer's legitimate performance expectations. And if we look at Mr. Borges' record, it's clear that the district court was justified in that holding. He receives early written warnings before RUI takes over, but RUI is aware of them, crass interactions that guests became aware of, verbally abusing his sous-chef. He's consistently coached by his general manager at RUI about financial expectations and his continued personnel problems. He's sent for training in September of 2008, two weeks in Minnesota, to go over the RUI tools to come up to speed, a recognition that you're not getting it, you need to get this. They invest two weeks in him to go get duplicative training with an expert in the company. In October of 2008, he has a confrontation with the food and beverage director about a menu that the food and beverage director, his superior, prepared. That food and beverage director talks to the general manager and says, hey, what's wrong with your guy being confrontational with his boss or a member of management? Mr. Borges admits in late 2008, he knew his job was in jeopardy. He had even been told to put out feelers. It was no secret to him his performance was not meeting the employer's legitimate expectations. What does he do in response? Again, if any of you have worked in a restaurant, December 22nd through 28th is a very busy time. He decides he'd request vacation during that period of time. And in the record, as the regional director, we said, she says, I was shocked. It's the first time any chef has ever even asked for vacation during that period of time. He receives a written warning in January of 2009. I need sustained and immediate involvement or improvement from you. Your job is in jeopardy. You don't improve, you're gone. What does he do? He doesn't improve. Guess what? He's terminated. The record is thorough that Mr. Borges was not meeting RUI's legitimate expectations of him as a chef. In opposition to summary judgment, what Mr. Borges says is basically, hey, I got a review back in September, four months or so before I was fired. And there were some things in there that weren't so bad. You know, the restaurant as a whole was meeting its sales expectations. And, of course, if you're not controlling your labor costs and not controlling your food costs, so it's likely that the guests are having a nice experience and the sales might be met. And there was a note in the review that, well, you're implementing some of our practices, some of the RUI practices. But that same review that counsel relies on also noted that he wasn't meeting his kitchen cost goals, he wasn't meeting his assigned budgets, and his turnover was too high. So even the evidence they rely on was critical of Mr. Borges. So in short, the admissible evidence fully supports the district court's granting of summary judgment. The one aspect to this case today that we didn't have at the district court is that we have the Shelley decision coming out of the Ninth Circuit earlier this year, in which the Ninth Circuit has said we do the burden shifting on an ADA case at summary judgment, even though it's a but-for standard at trial. At summary judgment, we apply the burden shifting. It's a little unclear, I think, in the law right now whether the traditional McDonnell-Douglas test applies or whether it needs to be tweaked, given the ultimate liability standard being but-for. But for our purposes, just the straight standard McDonnell-Douglas, we have to have direct or circumstantial evidence of pretext. Clearly, RUI is articulated in nondiscriminatory rationale. Is there direct evidence? Clearly not. There's one alleged stray remark, but it has nothing to do with any decisionmaker. So we look to circumstantial evidence. The Court in Shelley said, well, how do we – what is – what is this circumstantial evidence? Well, it is specific, substantial, admissible evidence of internal inconsistencies or other factors indicating that the reasons just aren't believable. Now, there is no internal inconsistency briefed to the Court. The reason that is, is because the plaintiffs never took discovery on comparables. There's no indication in the record at all of how comparable employees were treated or weren't treated. So we look at, well, has – have the plaintiffs, any of them, provided the Court with evidence, be it specific and substantial evidence or otherwise, that the articulated reasons shouldn't be believed? And we have Ninth Circuit case law that says, well, an employee's subjective belief as to their qualifications, that doesn't get you a triable issue. We've got using subjective factors. That doesn't get you a triable issue in the Ninth Circuit. We have the Ninth Circuit adopting the Seventh Circuit in the Coleman case, and in the case commonly referred to as sort of the super-personnel board line of cases, which is, listen, our job as a court is not to second-guess the employer. We might not agree with the business decision you made. We might think in review that you made the wrong decision. You might have read the numbers wrong. It's not our role to second-guess you. All right? It's the plaintiff's role to produce specific and substantial evidence that those weren't the reasons for the termination. All right? Here we look at what plaintiffs have provided to show or to argue to the Court that, well, you shouldn't believe that the performance reasons were really what was going on here. We've got one ageist remark, allegedly, involving Mr. Fry, that plaintiffs try to attribute to all the plaintiffs. There's no indication when it was made, by who it was made. There's no indication that anyone, any manager involved in this record made the comment. So that's not getting plaintiffs where they need to be. Plaintiffs try to argue, well, working for RUI was kind of like working for PCR, Pacific Coast Restaurants. And so we didn't get fired with PCR, and we got fired with RUI. So, gosh, that must mean there's something sort of age-related here. What plaintiffs haven't addressed, though, is the more important criteria, which is, do they treat the rules the same? The reality is, at PCR, in the record, two years prior to RUI taking over the PCR operations, they didn't fire a single chef in two years. See, they might have had some similarity in processes, but when their chefs violated those processes, they didn't do anything about it. Or perhaps they disciplines and terminate chefs who don't comply with their policies and their practices. That's the critical distinction that's not addressed by plaintiff in their brief. Also, and running short on time, if the Court were to look at the evidence actually cited, and this is where we get into a problem of not having an excerpt of a record, the propositions in plaintiffs in moving brief are far different than the actual testimony of what these plaintiffs testified as to their experience at the two different restaurants. Another, and I'm running out of time, so I won't belabor it, but another point they raise is that, well, with Mr. Gates, they manipulated labor costs. They added this labor in, and it counseled him that he had to meet his labor costs. And then, lo and behold, after he's fired, the labor cost is taken out. And, boy, that must mean they were trying to set up this guy. Well, there's no testimony in the record as to the circumstances. These are merely exhibits to a deposition. It's not even clear in the record that the labor cost that was added and the labor cost that was taken out are even the same person. It's nowhere in the record. The decision-maker apparently, this e-mail that says, well, Mr. Knutson said he wants this labor cost out, there's no indication that Mr. Knutson was at all involved in any of these people's employment. And there's also no indication that when the labor cost was added in, that the food budget or the labor budget wasn't also adjusted. There's no testimony to that effect. So it doesn't move the ball in the least in terms of establishing pretexts, certainly not specific and substantial evidence of pretext. Thank you. Your time has expired. Thank you. The case just argued, Bilicus v. Restaurants Unlimited, is submitted for decision.
judges: Ripple, McKeown, Nguyen